

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **TSC SIEBER SERVICES, LC** | § | |
| xxx-xx-4858 | § | Case No. 09-61042 |
| | § | |
| | § | |
| Debtor | § | Chapter 7 |

| | | |
|---|---|---|
| STEPHEN J. ZAYLER, Trustee | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 10-6031 |
| | § | |
| JERRY DON CALICUTT, Jr. | § | |
| | § | |
| | § | |
| Defendant | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

### Findings of Fact

1.    On October 17, 2009,  TSC Sieber Services, LC (hereafter referenced as the
     "Debtor" or the "Company"), filed a Chapter 11 voluntary petition for bankruptcy
     relief under Title 11, United States Code, in the United States Bankruptcy Court
     for the Eastern District of Texas, Tyler Division, under case no. 09-61042.[2]

---

[1] These findings and conclusions are not designated for publication and shall not be considered
as precedent, except under the respective doctrines of claim preclusion, issue preclusion, the law of the
case or as to other evidentiary doctrines applicable to the specific parties in this proceeding.

[2] Stipulated fact 3(a).  This is the first of several factual stipulations by the parties that were set
forth in the approved Joint Pre-Trial Order entered in this adversary proceeding on April 2, 2012.  The
Court adopts the stipulations of fact reached by the parties but will reference only those facts necessary or
germane to a decision on this matter.

2.      The case was subsequently converted to Chapter 7 on November 2, 2009, and Stephen J. Zayler was appointed as the Chapter 7 Trustee (the "Trustee").[3]

3.      The Debtor was primarily engaged in the business of pipeline construction.[4]

4.      The Debtor eventually conducted its operations from three locations – Arp, Texas, Millsap, Texas, and Keithville, Louisiana.[5]

5.      The principal owners and/or members of the Debtor corporation were
         -AW&J Family Limited Partnership, a partnership owned by J.D. Calicutt, Sr. and Fay Calicutt;[6]
         -Teresa Calicutt;
         -Scotty Sieber, Jr. (son of Teresa Calicutt); and
         -Justin Colt Sieber (son of Teresa Calicutt).[7]

6.      After a brief period of business operations as a partnership, the members formed TSC Sieber Services, LC on August 25, 2006[8] as a Texas limited liability company.[9]

7.      The Certificate of Formation for the Company identified Teresa Calicutt, Justin Colt Sieber, Scotty Sieber, Jr. and AW&J Partnership, LP, (by its duly authorized agent Jerry Don Calicutt, Sr.) as members of the LLC with each member owning a 25% share of the company.[10]

---

[3]  Stipulated fact 3(b).

[4]  Stipulated fact 3(c).

[5]  Stipulated fact 3(d).  The Millsap location was added in the fall of 2006, and the Keithville site in December 2007.  Stipulated fact 3(m).

[6]  J.D. Calicutt, Sr. and Faye Calicutt are the father and mother of Teresa Calicutt and of the Defendant, Jerry Don Calicutt, Jr., known to the family as "Don."  Stipulated fact 3(e).

[7]  *Id.*

[8]  Stipulated fact 3(f).

[9]  Stipulated fact 3(g).  J.D. Calicutt, Sr. had previously engaged in a successful business operation.  See Ex. 16 at TSC-0518.

[10]  Stipulated fact 3(h).

8.    An election of officers was held after the formation of the LLC.  Officers were elected as follows:

        Justin Colt Sieber, President;
        Teresa Calicutt, Secretary;
        Scotty Sieber, Jr., Vice President; and
        J. D. Calicutt, Sr., Chairman.[11]

9.    The Defendant, Don Calicutt, began working in the newly-organized family business in April 2006 prior to the LLC's creation.[12]

10.    However, the Defendant held no formal office nor was he formally issued any interest in the Company, ostensibly to avoid entangling the family business in various unrelated personal legal problems involving the Defendant and to protect the family company from any negative ramifications arising from any known association with the Defendant.

11.    The business affairs of the Company were to be directed by Teresa Calicutt, and there was to be no public acknowledgment of any formal business affiliation between the Company and the Defendant.

12.    However, the family was willing to provide a covert income stream to the Defendant, while again trying to avoid entangling the company in the ramifications of the Defendant's legal problems.

13.    The financial benefits intended to be provided by the Company to the Defendant consisted primarily of the concealed right to a share of the net income of the Company equivalent of that realized by the publicly-named members of the Company, against which certain periodic draws could be taken.

14.    However, those plans changed when Teresa Calicutt suffered significant injuries in a fall at the office in Arp, Texas, in the spring of 2006.  She was unable to work for the Company on a regular basis thereafter.[13]

---

[11]  Stipulated fact 3(i).

[12]  Stipulated fact 3(k).

[13]  Stipulated fact 3(n).

15.    Because Teresa Calicutt was thereafter unable, due to her injuries, to provide day-to-day supervision of the corporate business affairs in a critical time in which the now-established LC was expanding its scope of business, the original plan to conceal any involvement of the Defendant with the Company was required to be altered.

16.    Because of her inability to work due to injury, Teresa Calicutt, together with her father and the family patriarch, J. D. Calicutt, Sr., requested that the Defendant take direct managerial control of the Company since Teresa's sons, Scotty and Colt, though designated as members and officers, were young and did not have the necessary business experience to direct the affairs of the company.[14]

17.    Despite this expanded role in direct management of the Company, the Defendant had no written employment or consulting contract with TSC Sieber Service, LC.[15]

18.    Defendant started receiving compensation on a consistent basis, however, on August 16, 2006, in the amount of $1,000 each week through payments made to AW&J Family Limited Partnership which were subsequently transferred to the Defendant on its books and records.[16]

19.    Double withdrawals were credited by the Company on its books and records to the account of AW&J Family Limited Partnership for compensation for J. D. Calicutt, Sr. as well as for the payments to the Defendant.[17]

20.    The company set up general ledger accounts for the compensation and benefits received by the Defendant.  The accounts are identified on the company's books as:

| | |
|---|---|
| Account No. 3138 | Draws – AW&J-JDC, Jr. |
| Account No. 6576 | Mgmt/Consulting Fee-JDC, Jr. |
| Account No. 2310 | Accrual Fees & Expenses-Mgmt/Consulting |
| Account No. 6573 | Professional Fees-Mgmt/Consulting |
| Account No. 60810 | Investor Relations-D. Calicutt, Jr.[18] |

---

[14]  Stipulated fact 3(o).

[15]  Stipulated fact 3(r).

[16]  Stipulated fact 3(q).

[17]  Stipulated fact 3(s).

[18]  Stipulated fact 3(p).

21.    Those payments to the Defendant that did not constitute legitimate business expenses of the Company would be treated as part of the Defendant's annual compensation and his withdrawals from the various accounts would be reconciled annually with his proportionate share of the Company's revenue for that particular year.

22.    The Defendant directed the affairs of the Company through the remainder of 2006.

23.    The Company's general ledger for 2006 shows that the Defendant received payments in 2006 for $19,244.21, charged to Account No. 3138, and $23,000.00 which was charged to Account No. 6573.[19]

24.    The Company's P&L statement for January through December 2006 showed net income of $1,396,465.83 for the Company.[20]

25.    A 2006 tax return for the Company (the "proposed 2006 return") was prepared and actually signed by Tom Gay, the company's certified public accountant, on June 15, 2007,[21] and tendered to the Company.  The proposed return was ready for filing with the IRS.

26.    The proposed 2006 tax return — with proposed K-1s attached — showed Teresa Calicutt, Justin Colt Sieber, Scotty Sieber, Jr., J. D. Calicutt, Sr. as having received a distribution of $349,117 for 2006, each arising from a 20% ownership interest.[22]

27.    That proposed return also showed the Defendant as the remaining 20% owner and having received a similar $349,117 member distribution – which was consistent with Tom Gay's understanding of the ownership structure and the actual financial functioning of the Company.[23]

---

[19]  Stipulated fact 3(t).  Because the $23,000 apparently constituted payment for actual services rendered by the Defendant in 2006, it was treated as a legitimate business expense of the Company and was not charged as an advance against the Defendant's ultimate proportionate share of profit.  This perhaps explains why the Trustee does not include this category in his accounting summary.  See Ex. 26.

[20]  Stipulated fact 3(pp).

[21]  Ex. 4 and stipulated fact 3(ii).

[22]  Ex. 4 and stipulated fact 3(jj).

[23]  *Id.*

28.    The proposed 2006 tax return identified no expenses for management consultant services on "Statements, Form 1065, Line 20, Other Deductions."[24]

29.    The proposed 2006 tax return, as prepared by Mr. Gay, was never filed.[25]

30.    In lieu thereof, Gay was instructed by the Company to revise the proposed return. He was instructed that "under no circumstances should Don's [the Defendant] 20% ownership be traceable by anyone outside TSC Sieber Services, LC as any type of ownership per Teresa."[26]

31.    A revised 2006 tax return for the Company was prepared by Gay and signed by Teresa Calicutt, on behalf of the Company, on September 8, 2007.[27]  It was subsequently filed with the IRS.

32.    The revised 2006 tax return that was actually filed attached K-1s that attributed $349,116 in compensation as designated 25% owners to Teresa Calicutt, Justin Colt Sieber, Scotty Sieber, Jr. and the AW&J Family Limited Partnership, LP, respectively.[28]

33.    The advances received by the Defendant in 2006 in anticipation of the ultimate financial distribution equivalent to that received by each of the four designated

---

[24]  Ex. 4 and stipulated fact 3(kk).

[25]  Stipulated fact 3(ll).

[26]  Ex. 7 at p. TSC-0497.   Teresa Calicutt confirmed this directive in her deposition testimony through the following colloquy:

>    Q (by Mr. Zayler):  Did you advise the CPA through Babby Wise that as indicated in that [email], that Don's 20 percent ownership interest was not to be listed as a partner?
>    A (by Ms. Calicutt):  ... I would say yes, I did.  Too, I would say yes because he was not an owner of the company.
>    Q:  Was he not an owner or was he not to be shown as an owner?
>    A:  He was not to be shown as an owner.

*Deposition of Teresa Calicutt* 16:17 -17:2.  See also Ex. 8.

[27]  Ex. 5 and stipulated fact 3(mm).

[28]  Ex. 5 and stipulated fact 3(nn).  The partnership was substituted in lieu of any reference to J.D. Calicutt, Sr.

-6-

LLC members would be treated as compensation for consultant services rendered, and not treated as a member distribution.[29]

34.     Thus, as confirmed by Tom Gay, the named members of the Company would be essentially dividing "25% of 80%."

35.     Thus, the revised 2006 tax return deleted any reference to a K-1 issued for the Defendant's receipt of $349,116 as a distribution for an owner-member and such sum was instead charged to the category of "Management Consulting" as shown on "Statement 1, Form 1065, Line 20, Other Deductions."[30]

36.     Thus, at the direction of the Company and its principals, the revised 2006 tax return re-characterized the amount paid to the Defendant in 2006 as a consultant compensation expense.

37.     Such replacement tax return of the Company was actually signed under penalties of perjury by Teresa Calicutt, as an executive officer of the Company, as well as by its tax professional, and was subsequently filed with the IRS.[31]

38.     The characterization of the compensation paid to the Defendant as set forth in that 2006 revised tax return — and as repeated in the 2007 and 2008 tax returns — is the best and most reliable evidence of the Company's intentions with regard to the proper calculation of sums due and owing to the Defendant by the Company.[32]

39.     The Trustee accepted, for the purposes of this dispute, the Defendant's contention that he was entitled to consultant compensation in an amount equivalent to that

---

[29]  This "arrangement," of course, could have a number of ramifications even to this date. However, other than as necessary to determine the scope of funds that should have been rightfully paid by the Company to the Defendant in the relevant time periods, such ramifications are beyond the scope of this dispute.  Further, consistent with the manner in which the Trustee's complaint was brought, the Court will characterize appropriate payments by the Company to the Defendant as consultant compensation, even though in other contexts alternative characterizations might be more appropriate.

[30]  Ex. 5 at p. TSC-0386 and stipulated fact 3(oo).

[31]  Ex. 5.

[32]  Due to the subsequent financial disintegration of the Company, resulting in its bankruptcy filing, the financial records of the Company are at best incomplete and, in various respects, they were not capable of reconciliation through an audit by the Trustee's accountant.  Nor has this Court attempted to reconcile any discrepancies in the various financial documents except as necessary to decide the particular issues presented by this dispute.

realized by the persons designated as members of the Company and therefore seeks only the return of those payments in excess of that 20% calculation formula.[33]

40. There was never any compensation arrangement between the Company and the Defendant based upon an EBITDA calculation as asserted by the Defendant.[34]

41. Notwithstanding the reference in the 2006 revised tax return that consultant compensation of $349,116 had been paid to the Defendant in 2006, only $19,244.21of that $349,116 was actually tendered by the Company to the Defendant during the calendar year of 2006.[35]

42. Thus, there was an accrued liability of $329,872.25 due and owing to the Defendant by the Company as of the end of 2006.

43. By all accounts, and perhaps due in part to the fact that all parties anticipated that the incapacitation period for Teresa Calicutt would be shorter than it would ultimately prove to be, the Defendant provided valuable managerial services to the Company during the year 2006 and did not abuse his managerial access to Company funds.

44. Accordingly, the compensation actually paid to the Defendant or accrued by the Company on his behalf for consultant services in 2006 constituted compensation that he was entitled to receive from the Company.

45. The Defendant directed the operational and business affairs of the Company, including the allocation of Company funds, throughout 2007 in the absence of Teresa Calicutt.

46. For various reasons, the Company did not enjoy financial success in 2007 as indicated by the Company's various financial statements.

---

[33] Ex. 26 at 1.

[34] Even if there had been such an arrangement, the Defendant failed to present cogent, reliable financial evidence to support his contention.

[35] Ex. 26 at 2 - denominated as "2006 Activity." This was an amount equivalent to the 20% calculation amount paid to all designated members of the LLC.

47.     One of the factors contributing to the Company's financial downturn in 2007 was the aggregate amount of funds directed by the Defendant to be improperly withdrawn from the Company for his personal benefit and use in excess of that to which he was entitled to receive from the Company.

48.     The Company's original 2007 tax return was filed on or about April 14, 2008[36] and was subsequently amended on January 9, 2009.[37]

49.     The 2007 amended tax return indicates the Company suffered a net loss in 2007 of <$1,874,236> per its income statement.[38]

50.     Accordingly, each of the listed 25% owners were given a K-1 that reflected a loss of <$468,559> for 2007.[39]

51.     Notwithstanding the serious financial circumstances leading to the $1.874 million net loss for the Company in 2007, and notwithstanding the fact that such loss should have rightfully negated any entitlement of the Defendant to compensation based upon realized profit, or at least limited him to his weekly allowance as an advance on any future profit, the Defendant unlawfully appropriated and utilized substantial sums of money from the Company for his own personal use and benefit in excess of that weekly allowance in 2007.

52.     The amended 2007 tax return indicates that $152,427 was paid in 2007 by the Company to the Defendant for "management consulting"services — as shown on "Statement 1, Form 1065, Line 20, Other Deductions."[40]

---

[36]  Ex. 19.

[37]  Ex. 20.  The amendments were basically minor and technical in nature.

[38]  *Id.*

[39]  Stipulated fact 3(ss).

[40]  Stipulated fact 3(rr).

53.   Additionally, the following payments from Company funds were made by, on behalf or to the benefit of the Defendant in 2007:

| Date | Payee | Description | Amount |
|------|-------|-------------|--------|
| 02/08/07 | Howard Britton (sic) (Atty) | Legal Fees | $ 10,200 |
| 02/19/07 | Phillip B. Baldwin, Jr. (Atty) | Legal Fees | 10,000 |
| 03/15/07 | Cash | Sign-on bonus | 5,000 |
| 03/16/07 | Cash | Sign-on bonus | 5,200 |
| 07/31/07 | Debit | Cashiers' Check | 50,000 |
| 08/10/07 | Debit | Cashiers' Check to United Title | 260,000 |
| 08/14/07 | Wayne Hammons | Boat and Motor | 3,000 |
| 09/12/07 | J.D. Calicutt | Tax Lien Satisfaction | 167,911 |
| 10/08/07 | AW& J Family Partnership | Jeep | 8,800 |
| | | | $520,111.[41] |

54.   Most, if not all, of the nine payments listed in ¶ 53 above constituted unauthorized payments by the Company for personal expenditures of the Defendant for which the Company would subsequently seek "restoration" from the Defendant — a restoration effort that was acknowledged and "accepted" by the Defendant.[42]

55.   Included among those improper payments directed by the Defendant was the tendering of Company funds in the amount of $260,000 in mid-August 2007 that was applied toward the Defendant's purchase of a house in his individual name located at 704 Chimney Rock Drive in Tyler, Smith County, Texas.

56.   The Company paid an aggregate sum of $810,344.78 to the Defendant in 2007 — arising from authorized compensation actually paid to the Defendant, as well as unauthorized payments made to, or for the benefit of, the Defendant by the Company at the Defendant's direction.[43]

---

[41]   Stipulated fact 3(w).

[42]   Ex. 24.

[43]   See Ex. 26 at 3 - denominated as "2007 Activity." The Trustee relied upon this lower number notwithstanding the fact that, at the direction of Teresa Calicutt, the Company's internal accounting staff produced in mid-2008 a report that revealed that in 2007 the Defendant received $767,544.78 in draws, $296,238.46 in consulting fees, and $28,044.21 in other compensation — for an aggregate sum of $1,091,827.45. See Ex. 9, Ex. 23 and stipulated fact 3(z). That amount differs in unspecified ways from the figures recorded in the 2007 general ledger which shows the following accounts were charged:

-10-

57.     The Trustee does not seek return of the $329,872.25 in funds paid to the Defendant in 2007 that were legitimately attributable to 2006 services for which he was not compensated in calendar year 2006.

58.     Recovery of $152,427 for compensation in 2007 that was recognized and ratified by the Company in its amended 2007 tax return, and was thereby authorized through its officers and members, is also precluded.

59.     Thus, $482,299.25 in Company funds were rightfully paid in 2007 to the Defendant as compensation and were funds which the Defendant was entitled to receive from the Company.

60.     Any remaining payments made to, or for the benefit of, the Defendant by the Company in 2007, including the unauthorized diversion of $260,000 in Company funds applied to the purchase of the real property and improvements located at 704 Chimney Rock Drive in Tyler, Smith County, Texas, exceeded the amount of compensation which the Company had agreed to pay to the Defendant and constituted a misappropriation of funds by the Defendant.

61.     The diversion of $260,000 in Company funds by the Defendant that was applied to the purchase of the real property and improvements located at 704 Chimney Rock Drive in Tyler, Smith County, Texas, was unauthorized and wrongful and resulted in the unjust enrichment of the Defendant.

62.     Payments made to, or for the benefit of, the Defendant by the Company in 2007 exceeded the amount of compensation that the Company had agreed to pay to the Defendant by at least the amount of $328,045.53.[44]

---

| | |
|---|---|
| Account No. 3138 | $767,544.78 |
| Account No. 6576 | 168,426.80 |
| Account No. 2310 | 8,800.00 |
| Account No. 6573 | 18,000.00 |
| | $962,771.58. |

See stipulated fact 3(v). Since the Trustee did not seek a recovery based upon these higher sums, the Court need not reconcile these discrepancies.

[44] See Ex. 26 at 3 - denominated as "2007 Activity" whereby the Court reduces the $480,472.53 booked by the Company as a "negative liability" by the amount recognized in the amended tax return as a legitimate consulting fee.

63.   The payments made to, or for the benefit of, the Defendant by the Company in 2007 that exceeded by $328,045.53 the amount of compensation that the Company had agreed to pay to him were wrongfully appropriated by the Defendant for his personal use and benefit with the fraudulent intent of depriving the Company of such funds.

64.   The Defendant continued to direct the business affairs of the Company, including the distributions of Company funds, from January 2008 through June 11, 2008.

65.   On June 11, 2008, the Defendant was terminated from his managerial position at the direction of Teresa Calicutt, after the internal audit revealed the amounts misappropriated by the Defendant in her absence in 2007.[45]

66.   The Company's 2008 tax return showed a net income of $493,754.00.[46]

67.   It is inappropriate to utilize a higher figure taken from a partial-year informal balance sheet or profit and loss statement produced internally by the Company as of July 2008 to calculate amounts due and owing to the Defendant for 2008, notwithstanding his termination at mid-year, since those informal statements were interim-type documents containing incomplete information that were never properly adjusted to the Company's books and records and that were never affirmed nor adopted by any Company representative nor certified by their accountant.[47]

68.   The 2008 tax return attached a K-1 that attributed net income of $123,437 to each of the designated owners — Teresa Calicutt, Justin Colt Sieber, Scotty Sieber, Jr. and the AW&J Family Limited Partnership, LP, respectively.[48]

69.   The general ledger "Account QuickReport" shows that the Defendant received approximately $159,479 for management consultant services for the period of January 1 through May 28, 2008.[49]

---

[45]   See supra note 42 and stipulated fact 3(aa).

[46]   Ex. 22 and stipulated fact 3(vv).

[47]   See Ex. Q.

[48]   Stipulated fact 3(ww).

[49]   Stipulated fact 3(xx).

70.   Based upon the compensation formula by which the Company had agreed to compensate the Defendant, the amount of money rightfully owed to the Defendant by the Company during the pro-rated portion of 2008 was $75,775.03.[50]

71.   Any remaining payments made to, or for the benefit of, the Defendant by the Company in 2008 exceeded the amount of compensation which the Company had agreed to pay to the Defendant.

72.   All payments made to, or for the benefit of, the Defendant by the Company in 2008 exceeded the amount of compensation that the Company had agreed to pay to the Defendant by $83,703.97.[51]

73.   The payments made to, or for the benefit of, the Defendant by the Company in 2008 that exceeded by $83,703.97 the amount of compensation that the Company had agreed to pay to him were wrongfully appropriated by the Defendant for his personal use and benefit with the fraudulent intent of depriving the Company of such funds.

74.   As a person authorized to transact business and direct financial activities on behalf of the Company in Teresa Calicutt's absence in 2007 and 2008, the Defendant acted as an agent of the Company.

75.   As an agent of the Company in 2007 and 2008, the Defendant had a formal fiduciary relationship with the Company.

76.   Further, the circumstances giving rise to the assumption of managerial control of the Company by the Defendant during Teresa Calicutt's absence, including, but not limited to, the recognition of the business inexperience of Scotty Sieber, Jr. and Colt Sieber, the emergency need to sustain the family business in the face of Teresa's absence for an indeterminate time, and under which the Company and its members turned to the Defendant as a family member and placed management of the family's business into the Defendant's hands during a time of crisis, created a special relationship between the Defendant and the Company.

---

[50]   See Ex. 26 at 4 - denominated as "2008 Activity" containing the calculations based upon 58% [7/12ths] of what the members should have received.

[51]   *Id.*

-13-

77.   In light of all of the circumstances surrounding the Defendant's control of the Company during Teresa Calicutt's absence in 2007 and 2008, the Defendant had an informal fiduciary relationship with the Company.

78.   In light of all of the circumstances surrounding the Defendant's control of the Company during Teresa Calicutt's absence in 2007 and 2008, the Defendant was required to place the interests of the Company above his own personal financial interests.

79.   The Defendant's unlawful appropriation for his own personal use and benefit of the aggregate sum of $411,749.50 of the Company's funds — being an amount exceeding the compensation to which he was rightfully entitled — constituted repeated breaches of his fiduciary duty to the Company.

80.   The Defendant's breaches of his fiduciary duty to the Company secured various personal benefits for himself and inflicted a significant financial injury upon the Company.

81.   None of the Company funds misappropriated by the Defendant have been repaid to the Company or to the Trustee by the Defendant.

82.   The Defendant was unjustly enriched by his unlawful appropriation for his own personal use and benefit of the aggregate sum of $411,749.50 of the Company's funds — constituting repeated breaches of his fiduciary duty to the Company.

83.   The Defendant was unjustly enriched by his unlawful diversion of $260,000 in Company funds that were directly applied to his personal purchase of the real property and improvements located at 704 Chimney Rock Drive in Tyler, Smith County, Texas.

84.   The Defendant was unjustly enriched by obtaining legal title to the real property and improvements located at 704 Chimney Rock Drive in Tyler, Smith County, Texas by his unlawful diversion of $260,000 at the expense of, and in violation of the rights of, the Company.

85.   It would be unjust and unconscionable to allow the Defendant, as the holder of legal title to the real property and improvements located at 704 Chimney Rock Drive in Tyler, Smith County, Texas, to retain the beneficial interests in such property that was wrongfully obtained by him through the improper diversion of $260,000 in Company funds that he was not authorized to take.

-14-

86.     The amount of Company funds wrongfully appropriated by the Defendant, or rendered to a third party for the personal benefit of the Defendant, constituted distinct transfers of an interest in property owned by the Company.

87.     The Trustee failed to prove; however, that, on the precise date of each transfer of funds to the Defendant, the Company was insolvent or became insolvent as a result of the transfer.

88.     The Defendant unlawfully appropriated from the Company through various transactions the aggregate sum of $411,749.50 that in each instance rightfully belonged to the Company.

89.     The Defendant unlawfully appropriated from the Company through various transactions the aggregate sum of $411,749.50 and engaged in each transaction without consent of the Company.

90.     The Defendant unlawfully appropriated from the Company through various transactions the sum of $411,749.50 and engaged in each transaction with an intent to deprive the Company of such property permanently.

91.     As a result of the Defendant's unlawful appropriations of its property, the Company sustained actual damages of $411,749.50.

92.     To the extent any of the above findings of fact is construed to be a conclusion of law, it is expressly adopted as such by this Court.

## CONCLUSIONS OF LAW

*Jurisdiction and Allocation of Judicial Power*

1.      This Court has subject matter jurisdiction under 28 U.S.C. §§1334 and 157(b), as well as 11 U.S.C. §§ 544, 548, and 550.

2.      The Court has personal jurisdiction over the parties to this adversary proceeding.

3.      This Court has the authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding under 28 U.S.C. §157(b)(2)(A), (E), (H), and (O).

4.      In the absence of a jury right timely demanded,[52] this Court has the authority to enter a final judgment in a fraudulent transfer cause of action brought in the exercise of trustee avoidance powers.  *McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1337 (5th Cir. 1995).

5.      The recognized authority of a bankruptcy court to enter a final judgment on a fraudulent transfer cause of action brought in the exercise of trustee avoidance powers on behalf of a bankruptcy estate was not impaired by the decision in *Stern v. Marshall*, ⸺ U.S. ⸺, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).  *See, e.g., Feuerbacher v. Moser (In re Feuerbacher),* 2012 WL 1070138, at *6-7 (E.D. Tex., Mar. 29, 2012) and cases cited therein.[53]

6.      To the extent that this adversary proceeding is subsequently construed to be statutorily, but not constitutionally, core under the principles expressed in *Stern*, this Court has the authority to enter a final judgment in this adversary proceeding by the consent of the parties.[54]


*Constructively Fraudulent Transfers*

7.      To establish the existence of a constructive fraudulent transfer under 11 U.S.C. §548(a)(1)(B), a plaintiff must show:
> (1) the debtor transferred an interest in property;
> (2) the transfer of that interest occurred within one year prior to the filing of the bankruptcy petition;

---

[52]  Litigants in a fraudulent conveyance action have a Seventh Amendment right to a jury trial and thereby a right to an Article III tribunal.  *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53(1989); *Tex. Gen. Petroleum Corp.*, 52 F.3d at 1336.  However, such a right may be waived if not timely demanded.  *Blackwell v. Zollino (In re Blackwell ex rel. Estate of I.G. Services, Ltd.)*, 267 B.R. 724, 727 n.2 (Bankr. W.D. Tex. 2001).  No jury demand was made in this action.

[53]  "*Stern* does not preclude the bankruptcy court from issuing a final judgment on claims where, as here, the Trustee seeks to recover fraudulent transfers."  *Feuerbacher,* 2012 WL 1070138 at *6.

[54]  See *Response of Jerry Don Calicutt, Jr. to the Plaintiff's Original Complaint* filed on May 16, 2001 [dkt #28] at ¶ 4; and *J. Don Calicutt's Approved Changes to the Joint Pre-Trial Order* at p. 1, ¶ A and as agreed stipulation of law at p. 2, ¶ 1(a), as incorporated by the Court into the *Pre-Trial Order* entered on April 2, 2012 [dkt #48].  However, in the event of a subsequent determination that an Article III forum was required for this dispute, these findings and conclusions are submitted for de novo review pursuant to 28 U.S.C. § 157(c)(1).

(3) the debtor was insolvent on the date of the transfer or became insolvent as a result thereof; and

(4) the debtor received less than reasonably equivalent value in exchange for such transfer.

*In re GWI PCS 1 Inc.,* 230 F.3d 788, 805  (5th Cir. 2000); *Chow v. Prince* (*In re Prince),* 2012 WL 1095506 at *6 (Bankr. E.D. Tex., Mar. 30, 2012).

8.      A party which seeks to avoid a transfer under §548 bears the burden of proof on all of the required elements, including the debtor's insolvency and the absence of reasonably equivalent value, by a preponderance of the evidence.  *Stettner v. Smith (In re IFS Financial Corp.),* 669 F.3d 255, 261 (5th Cir. 2012)  *Anderson v. Mega Lift Sys., LLC (In re Mega Sys., L.L.C.)*  2007 WL 1643182, at *6 (Bankr. E.D. Tex., June 4, 2007).

9.      The § 548 reachback period is limited to two years. *See* 11 U.S.C. § 548(a)(1).

10.     Any transfer to the Defendant occurring prior to October 17, 2007 is beyond the scope of avoidance under §548.

11.     Under 11 U.S.C. §544(b), a transfer may also be set aside in accordance with state law.  *Joe T. Dehmer Distributors, Inc. v. Murry Owen Temple*, 826 F.2d 1463, 1466 (5th Cir. 1987).

12.     Section 544 allows the trustee to step into the shoes of a creditor for the purpose of asserting causes of action under state fraudulent conveyance laws and confers on the trustee the status of a hypothetical creditor or bona fide purchaser as of the commencement of the case. *Stettner,* 669 F.3d at 261 n.3.

13.     Texas state law provides for recovery of a constructively fraudulent transfer on a showing substantially similar to that required by the Bankruptcy Code.  *Prince,* 2012 WL 1095506 at *6; *In re Enron Corp.*,  2005 WL 6237551, at *43 (Bankr. S.D. Tex., Dec. 9, 2005); *see* Texas Uniform Fraudulent Transfer Act ("TUFTA"), codified at 5 TEX. BUS. & COMM. CODE ANN.  §24.001 *et seq.* (Vernon 2009).

14.     However, unlike §548, the reachback period for fraudulent transfers under Texas law is four years.  *See* 5 TEX. BUS. & COMM.CODE ANN. § 24.010(a)(2) (Vernon 2009).

15.     TUFTA provides that a transfer is constructively fraudulent as to both present and future creditors if such a transfer was made without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:

> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transactions; or
>
> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

5 TEX. BUS. & COMM. CODE ANN. § 24.005(a) (Vernon 2009).

16.    TUFTA further provides, as to a present creditor, that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

5 TEX. BUS. & COMM.CODE ANN. § 24.006(a) (Vernon 2009).

17.    A party which seeks to avoid a transfer under §548 or under TUFTA bears the burden of proof on all of the required elements, including the debtor's insolvency and the absence of reasonably equivalent value. *Ingalls v. STMC Corp. (In re SMTC Mfg.)*, 421 B.R. 251, 279 (Bankr. W.D. Tex. 2009); *Anderson v. Mega Sys., LLC*, 2007 WL 1643182 at *6 (Bankr. E.D. Tex., June 4, 2007).

18.    Thus, under either section, the three elements the Trustee must prove with respect to each transfer is that: (1) a transfer occurred;[55] (2) that no reasonably equivalent value[56] was received by the Debtor for such transfer; and (3) that the Debtor was

---

[55]   A transfer is defined as "every mode ... of disposing of or parting with an asset or an interest in an asset...." 5 TEX. BUS. & COMM. CODE ANN. § 24.002(12) (Vernon 2009).

[56]   Section 24.004(d) of TUFTA provides that a "reasonably equivalent value" is given in a transfer when the amount received "is within the range of values for which the transferor would have sold the assets in an arms length transaction." 5 TEX. BUS. & COMM. CODE ANN. § 24.004(d) (Vernon 2009).

-18-

insolvent[57] when that transfer occurred.

19. In determining whether a transfer was fraudulent, the question of a debtor's solvency must be determined as of the time of each purported transfer. *Osherow v. Hensley (In re Pace)*, 456 B.R. 253, 273 (Bankr. W.D. Tex. 2011); *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25 (Tex. App. – Tyler 2000, pet. denied).

20. A plaintiff's failure to prove that, on the precise date of each transfer of funds, a debtor was insolvent or was rendered insolvent because of such transfer, precludes a recovery for fraudulent transfer under either §548 or TUFTA.

*Texas Theft Liability Act*

21. Under the Texas Theft Liability Act ("TTLA"), "a person who commits theft is liable [civilly] for the damages resulting from the theft." 6 TEX. PRAC. & REM. CODE §134.003(a) (Vernon 2011). *See generally*, *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.– Dallas 2009, pet. denied).

22. Theft is defined as "unlawfully appropriating property or unlawfully obtaining services as described by sections 31.03–31.07, or 31.11–31.14 of the Texas Penal Code." 6 TEX. PRAC. & REM. CODE §134.002(a) (Vernon 2011).

23. Section 31.03(a) of the Texas Penal Code provides that a person "commits an

---

[57] Section 24.003 of TUFTA addresses "insolvency" by providing that:

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b) A debtor who is generally not paying the debtor's debts as they become due is considered to be insolvent.
...

(d) Assets under this section do not include property that has been transferred, concealed or removed with intent to hinder, delay or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.

(e) Debts under this section do not include an obligation to the extent it is secured        by a valid lien on property of the debtor not included as an asset.

5 TEX. BUS. & COMM. CODE ANN. § 24.003(a), (b), (d) and (e) (Vernon 2009).

offense if he unlawfully appropriates[58] property with intent to deprive[59] the owner of property."  4 TEX. PENAL CODE §31.03(a) (Vernon Supp. 2012).

24.    The element of intent for these purposes can be inferred from the surrounding circumstances.  *Powers v. Caremark, Inc. (In re Powers)*, 261 Fed. Appx. 719, 722 (5th Cir. 2008).

25.    "Appropriation of property is unlawful if it is without the owner's effective consent." 4 TEX. PENAL CODE §31.03(b)(1) (Vernon Supp. 2012).

26.    Thus, as an unlawful appropriation of funds for personal use with a fraudulent intent, a civil theft under the TTLA constitutes embezzlement.  *Powers,* 261 Fed. Appx. at 722; *Andra Group, L.P. v. Gamble-Ledbetter (In re Gamble- Ledbetter)*, 419 B.R. 682, 696 (Bankr. E.D. Tex. 2009)

27.    Thus, to recover in this context for a civil theft under the TTLA, a plaintiff must establish:  (1) the plaintiff had a possessory right to property; (2) the defendant unlawfully appropriated property in violation of the theft provisions of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft. *Wellogix, Inc. v. Accenture, LLP*, 788 F.Supp.2d 523, 542 (S.D. Tex. 2011).

28.    Notwithstanding the fact the TTLA incorporates the definition of a theft from the Texas Penal Code, a plaintiff seeking recovery under the statute must prove the elements only by a preponderance of the evidence.  *Powers*, 261 Fed. Appx. at 721.

29.    A person who has sustained damages resulting from theft may recover actual damages, additional statutory damages of up to $1,000, court costs and reasonable attorney's fees under this civil liability statute.  6 TEX. PRAC. & REM. CODE §134.005 (Vernon 2011); *TXCO Resources, Inc. v. Peregrine Petroleum, LLC (In re TXCO Resources, Inc.)* 475 B.R. 781, 834 (Bankr. W.D. Tex. 2012).

---

[58]  A person "appropriates" property when he "bring[s] about a transfer or purported transfer of title or other non-possessory interest in property, whether to the actor or another, or acquire[s] or otherwise exercise control over property other than real property.  4 TEX. PENAL CODE §31.01(4) (Vernon Supp. 2012).

[59]  To "deprive" another of property includes any action "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner" or "to dispose of property in a manner that makes recovery of the property by the owner unlikely."   4 TEX. PENAL CODE §31.01(2)(A) and (C) (Vernon Supp. 2012).

30.     The award of $1,000.00 statutory damages is contingent upon an award of actual damages.  *Jones v. Texas Dept. of Criminal Justice,*  2009 WL 2645028, at *2 (Tex. App.– Corpus Christi 2009, no pet.).  "Actual damages," within the meaning of the Act, are those recoverable at common law.  *Beaumont v. Basham,*  205 S.W.3d 608, 619 (Tex. App.– Waco 2006, pet. denied).

*Breach of Fiduciary Duty*

31.     The term "fiduciary" refers to a person owing a duty of integrity and fidelity, and "it applies to any person who occupies a position of peculiar confidence towards another." *Kinzbach Tool Co. v. Corbett–Wallace Corp*., 138 Tex. 565, 160 S.W.2d 509, 512 (1942).

32.     "Generally speaking, it applies to any person who occupies a position of peculiar confidence towards another. It refers to integrity and fidelity. It contemplates fair dealing and good faith, rather than legal obligation, as the basis of the transaction." *Id.*

33.     There are two general categories of fiduciary relationships recognized under Texas law.

34.     One category is a formal fiduciary relationship that arises as a matter of law, and includes relationships between attorney and client, principal and agent, partners, and joint venturers.  *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002).

35.     The relationship between agent and principal is a fiduciary relationship.  *SJW Property Commerce, Inc. v. SW Pinnacle Properties, Inc.*, 328 S.W.3d 121, 155 (Tex. App.– Corpus Christi 2010, pet. denied).

36.     "An agent is one who is authorized by a person or entity to transact business or manage some affair for the person or entity."  *Id. (citing Welch v. Coca–Cola Enters., Inc*., 36 S.W.3d 532, 539 (Tex. App.– Tyler 2000, pet. withdrawn).

37.     "The critical element of an agency relationship is the right to control, and the principal must have control of both the means and details of the process by which the agent is to accomplish his task in order for an agency relationship to exist." *McAfee, Inc. v. Agilysys, Inc*., 316 S.W.3d 820, 829 (Tex. App. – Dallas 2010, no pet.).

-21-

38.  The existence of an agency relationship may be established by circumstantial evidence based upon proof of all the facts and circumstances that shows the relationship of the parties and throws light upon the character of such relations. *SJW Property Commerce,* 328 S.W.3d at 155; *Schultz v. Rural/Metro Corp. of New Mexico-Texas*, 956 S.W.2d 757, 760 (Tex. App. – Houston [14th Dist.] 1997, no pet.).

39.  A second category under which a fiduciary capacity is recognized under Texas law is an informal fiduciary relationship or a "confidential relationship" that may arise from moral, social, domestic, or personal relationships in which one person trusts in and relies on another. *Schlumberger Technology Corp. v. Swanson,* 959 S.W.2d 171, 176 (Tex.1997); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp*., 823 S.W.2d 591, 594-95 (Tex. 1992); *superseded by statute on other grounds as noted in Subaru of Am. Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225-26 (Tex. 2002); *In re Estate of Abernethy*,  2012 WL 1943760, at * 4 (Tex. App.– El Paso, May 30, 2012).

40.  "A fiduciary relationship exists when the parties are under a duty to act or give advice for the benefit of another upon matters within the scope of the relationship." *Wellogix, Inc. v. Accenture, LLP*, 788 F.Supp.2d 523, 544 (S.D. Tex. 2011) (*citing Stephanz v. Laird*, 846 S.W.2d 895, 901 (Tex. App. – Houston [1st Dist.] 1993, pet. denied).

41.  Such a relationship "exists where a special confidence is placed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one placing confidence." *American Medical Intern., Inc. v. Giurintano*,  821 S.W.2d 331, 339 (Tex. App.– Houston [14th Dist.] 1991, no pet.).

42.  "The law recognizes the existence of confidential relationships in those cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Crim Truck,* 823 S.W.2d at 594, (*citing Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex.1980)).

43.  "The effect of imposing a fiduciary duty is to require the fiduciary party to place someone else's interests above its own." *Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex. App.– Fort Worth 2011, no pet.).

44.  Accordingly, "a fiduciary relationship is an extraordinary one and will not be lightly created; the mere fact that one subjectively trusts another does not, alone,

indicate that he placed confidence in another in the sense demanded by fiduciary relationships because something apart from the transaction between the parties is required." *American Medical Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 339 (Tex.App.-Houston 1991, no pet.).

45.     The elements of a breach of fiduciary duty claim under Texas law are: (1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant. *Meaux Surface Protection, Inc. v. Fogleman,* 607 F.3d 161, 169 (5th Cir. 2010); *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.– Dallas 2006, pet. denied).

*Unjust Enrichment and Constructive Trusts*

46.     "Unjust enrichment is an equitable principle holding that one who receives benefits unjustly should make restitution for those benefits." *Hern Family Ltd. P'ship v. Compass Bank*, 2012 WL 1029533, at *10 (S.D. Tex., Mar. 26, 2012) (citing *Villarreal v. Grant Geophysical, Inc*., 136 S.W.3d 265, 270 (Tex.App.-San Antonio 2004, pet. denied)).

47.     "Unjust enrichment occurs when the person sought to be charged has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Id.*

48.     "A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex.1992).

49.     "Unjust enrichment characterizes the result or failure to make restitution of benefits received under such circumstances as to give rise to an implied or quasi-contract to repay.  It has also been said that recovery under unjust enrichment is an equitable right and is not dependent on the existence of a wrong." *Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc*., 300 S.W.3d 348, 367 (Tex. App.– Dallas 2009, pet. denied) (*citing Villarreal*, 136 S.W.3d at 270.).

50.     "A constructive trust is an available remedy imposed to redress wrong or prevent unjust enrichment under the circumstances." *Young v. Fawcett,* 2012 WL 3030358, at *5 (Tex. App.– Beaumont, July 26, 2012, no pet.) (*citing Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex.1974)).

51.  As a constructive trust is remedial in nature, the Court looks to Texas law concerning the elements of a constructive trust. *In re Vela*, 2006 WL 6544155, at *3 (Bankr. N.D. Tex., Mar. 27, 2006); *Continental Cas. Co. v. Kellogg (In re Chanel Fin., Inc.)*, 102 B.R. 549 (Bankr.N.D.Tex.1988).

52.  Under Texas law, a constructive trust is a flexible equitable remedy applied where one party "holds funds which in equity and good conscience should be possessed by another." *Tisino v. R & R Consulting and Coordinating Group, L.L.C.*,  2012 WL 2005282, at *2 (5th Cir., June 5, 2012) (citing *Meadows v. Bierschwale*, 516 S.W.2d 125, 131 (Tex.1974).

53.  "Constructive trusts, being remedial in character, have the very broad function of redressing wrong or unjust enrichment in keeping with basic principles of equity and justice." *Holmes v. Kent*, 221 S.W.3d 622, 628 (Tex. 2007).

54.  Section 55 of the Restatement (Third) of Restitution and Unjust Enrichment provides:

> If a defendant is unjustly enriched by the acquisition of title to identifiable property at the expense of the claimant or in violation of the claimant's rights, the defendant may be declared a constructive trustee, for the benefit of the claimant, of the property in question and its traceable product.

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 55 (2011).

55.  Thus, when the legal title to property has been obtained through means that render it unconscionable for the holder of legal title to retain the beneficial interest, equity imposes a constructive trust on the property in favor of the one who is equitably entitled to the same.  *Fitz–Gerald v. Hull*, 150 Tex. 39, 237 S.W.2d 256, 262–63 (1951).

56.  "A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment—a breach of duty or an actual or constructive fraud must be present in order to impose a constructive cause."  *Hahn v. Love,* 321 S.W.3d 517, 533 (Tex. App.– Houston [1st Dist.] 2009, pet. denied) (citing *Medford v. Medford,* 68 S.W.3d 242, 248 (Tex. App.– Fort Worth 2002, no pet.).

57.  "A party seeking to impose a constructive trust has the initial burden of tracing funds to the specific property sought to be recovered."  *Wilz v. Flournoy*,  228 S.W.3d 674, 676 (Tex. 2007).

58. "Once that burden is met, the entire ... property will be treated as subject to the trust, except in so far as the trustee may be able to distinguish and separate that which is his own." *Id.* (*quoting Eaton v. Husted*, 141 Tex. 349, 172 S.W.2d 493, 498-99 (1943) (internal quotations omitted)).

59. To warrant the imposition of a constructive trust as a remedy under Texas law, "a proponent must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res." Hahn, 321 S.W.3d at 533 (citing *Hubbard v. Shankle*, 138 S.W.3d 474, 485 (Tex. App.– Fort Worth 2004, pet. denied).

*Award of Judgment*

60. The Trustee is entitled to recover, in his capacity as the trustee of the Chapter 7 Bankruptcy Estate of TSC Sieber Services, LC,  the sum of $411,749.50 from the Defendant as actual damages arising from the misappropriation of funds and breaches of fiduciary duty committed by the Defendant and to prevent the unjust enrichment of the Defendant arising from his unauthorized actions.

61. The Trustee is entitled to recover, in his capacity as the trustee of the Chapter 7 Bankruptcy Estate of TSC Sieber Services, LC, the sum of $1,000 from the Defendant as statutory damages under the Texas Theft Liability Act.  6 TEX. PRAC. & REM. CODE §134.005(a) (Vernon 2011).

62. The Trustee is entitled to recover court costs in the amount of $250 from the Defendant.  6 TEX. PRAC. & REM. CODE §134.005(b) (Vernon 2011).

63. The Trustee is entitled to prejudgment interest on such judgment sum accruing from December 9, 2010, the date the lawsuit was filed, until the date of judgment at the rate of 5% per annum.  *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 531-32 (Tex. 1998).

64. Thus, the Trustee is entitled to pre-judgment interest through October 18, 2012, in the amount of $38,391.36.

65. The Trustee is entitled to post-judgment interest at a rate of 0.18%.  28 U.S.C. §1961.

66.   The Trustee is entitled to a declaration that, in his capacity as the trustee of the Chapter 7 Bankruptcy Estate of TSC Sieber Services, LC, he is the equitable owner of the real property and all improvements thereon located at 704 Chimney Rock Drive in Tyler, Smith County, Texas.

67.   The Trustee is entitled to a declaration that the Defendant holds legal title to the real property and all improvements thereon located at 704 Chimney Rock Drive in Tyler, Smith County, Texas, as constructive trustee for the use and benefit of the Chapter 7 Bankruptcy Estate of TSC Sieber Services, LC.

68.   The Trustee is entitled to turnover of the possession of the real property and all improvements thereon located at 704 Chimney Rock Drive in Tyler, Smith County, Texas in enforcement of the constructive trust and the equitable ownership of such property awarded herein

69.   Thus, the Plaintiff, Stephen J. Zayler, in his capacity as the trustee of the Chapter 7 Bankruptcy Estate of TSC Sieber Services, LC, shall recover from the Defendant, Jerry Don Calicutt, Jr., the sum of $ 412,749.50, plus pre-judgment interest in the amount of $38,391.36, for an aggregate award of $451,140.86, together with post-judgment interest upon such aggregate sum at the current federal post-judgment interest rate of 0.18% until paid.

70.   It is further declared that the Plaintiff, Stephen J. Zayler, in his capacity as the trustee of the Chapter 7 Bankruptcy Estate of TSC Sieber Services, LC, is the equitable owner of the real property and all improvements thereon located at 704 Chimney Rock Drive in Tyler, Smith County, Texas.

71.   It is further declared that the Defendant, Jerry Don Calicutt, Jr., holds legal title to the real property and all improvements thereon located at 704 Chimney Rock Drive in Tyler, Smith County, Texas, as constructive trustee for the use and benefit of the Chapter 7 Bankruptcy Estate of TSC Sieber Services, LC.

72.   It is further declared that the Defendant, Jerry Don Calicutt, Jr., shall forthwith relinquish possession of the real property and all improvements thereon located at 704 Chimney Rock Drive in Tyler, Smith County, Texas, and turnover possession of such property to the Plaintiff, Stephen J. Zayler, in his capacity as the trustee of the Chapter 7 Bankruptcy Estate of TSC Sieber Services, LC.

73.   All other relief requested in the Trustee's Complaint in the above-referenced adversary proceeding shall be denied.

74.     An appropriate judgment shall be entered consistent with these findings and
        conclusions.

75.     To the extent any of the above conclusions of law is construed to be a finding of
        fact, it is expressly adopted as such by this Court.


                        Signed on 10/18/2012


                        _____
                        THE HONORABLE BILL PARKER
                        UNITED STATES BANKRUPTCY JUDGE